# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

BANK OF AMERICA, N.A.,

     Plaintiff

v.

TUSCALANTE HOMEOWNERS
ASSOCIATION, et al.,

     Defendants

Case No.: 2:16-cv-00918-APG-DJA

**Order (1) Granting Bank of America's
Motion for Summary Judgment,
(2) Denying Premier's Motion for
Summary Judgment, (3) Dismissing as
Moot Bank of America's Damages Claims
against Tuscalante and NAS, and
(4) Denying as Moot Tuscalante's Motion
for Summary Judgment**

[ECF Nos. 60, 61, 62]

Plaintiff Bank of America, N.A. sues to determine whether a deed of trust still encumbers property located at 7424 Calzado Drive in Las Vegas following a non-judicial foreclosure sale conducted by a homeowners association (HOA), defendant Tuscalante Homeowners Association (Tuscalante). Bank of America seeks a declaration that the HOA foreclosure sale did not extinguish the deed of trust and it asserts alternative damages claims against Tuscalante and Tuscalante's foreclosure agent, defendant Nevada Association Services, Inc. (NAS). Defendant SNJ Enterprises, Inc. (SNJ) purchased the property at the HOA sale. It later quitclaimed the property to defendant Premier One Holdings, Inc. (Premier), who subsequently assigned rents and profits to defendant Acadia Investment (Acadia). Bank of America asserts an unjust enrichment claim against Acadia for the rents and profits received. Premier counterclaims to quiet title in its favor.

Bank of America moves for summary judgment, arguing that tender was futile because NAS had a known policy that it would not accept a payment from Bank of America.

Alternatively, it argues the homeowners tendered payments sufficient to satisfy the superpriority amount prior to the sale.

Premier opposes and moves for summary judgment, arguing that the sale complied with Nevada law and it is a bona fide purchaser. Premier also argues futility of tender does not apply because Bank of America never sought to tender payment with respect to this property. And it contends homeowner tender does not apply because the homeowners' payments were not actually applied to the superpriority amount. Premier asserts that NAS used the payments to cover costs and did so under the homeowners' payment plan and with Tuscalante's knowledge and acquiescence. Tuscalante then applied whatever payments it received from NAS to the oldest assessment first, but those payments were insufficient to cover the superpriority amount. Premier also argues the equities weigh in favor of allowing part of the payments to be applied to costs because HOAs could not retain foreclosure agents if collection costs would not be paid. Tuscalante also moves for summary judgment, arguing that the sale complied with Nevada law.

The parties are familiar with the facts, so I do not repeat them here except where necessary to resolve the motions. I grant Bank of America's motion and deny Premier's motion because no genuine dispute remains that the homeowner tendered payments sufficient to satisfy the superpriority amount and those payments were, by Tuscalante's own policy, required to be applied to the oldest assessment first. I dismiss as moot Bank of America's damages claims against Tuscalante and NAS. Because no party moved for summary judgment on Bank of America's unjust enrichment claim against Acadia, that claim remains pending.

**II.  ANALYSIS**

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a), (c).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).

A homeowner's payments can cure the superpriority default. *9352 Cranesbill Tr. v. Wells Fargo Bank, N.A.*, 459 P.3d 227, 230 (Nev. 2020).  In general, "[w]hen a debtor partially satisfies a judgment, that debtor has the right to make an appropriation of such payment to the particular obligations outstanding." *Id.* (quotation omitted).  "The debtor must direct that appropriation at the time the payment is made." *Id.* (quotation omitted).  If the debtor does not direct how to apply the payment, then the creditor may decide how to allocate it. *Id.*  "If neither the debtor nor the creditor makes a specific application of the payment, then it falls to the court to determine how to apply the payment" by reference to "the basic principles of justice and equity so that a fair result can be achieved." *Id.* (quotation omitted).

The parties dispute whether the former homeowners' payments sufficed to satisfy the superpriority lien.  In 2010, the monthly assessment was $49.25. ECF No. 61-5 at 34-35.  There

1    were no maintenance or nuisance abatement charges for this property. *Id.* at 51, 71-72.

2    Consequently, the maximum superpriority amount was $443.25, reflecting the nine months of

3    unpaid assessments leading up to June 2010.

4          Tuscalante had a collections policy that provided that "[a]ll payments received by the

5    Association, regardless of the amount paid, will be directed to the oldest assessment balance

6    first, until such time all assessment balances are paid, and then to the late charges, interest, and

7    costs of collection unless otherwise specified by written agreement." ECF No. 61-5 at 121; *id.* at

8    37-39.  Tuscalante entered into an agreement with NAS under which NAS would act as

9    Tuscalante's debt collection agent. *Id.* at 191.  That agreement did not specify whether NAS

10   could deduct its own costs from payments received from homeowners before remitting the

11   balance to Tuscalante. *Id.* at 65, 191.  Tuscalante provided its collection policy to NAS and

12   expected NAS to abide by it. *Id.* at 21, 31.

13         The notice of delinquent assessment lien was recorded in June 2010. ECF No. 61-4.  A

14   month later, the then-homeowner, Nicholas McCurdky-Luksch (Luksch), requested a payment

15   plan from NAS. ECF No. 61-5 at 226.  NAS responded on August 9 with a proposed six-month

16   payment plan of $308 per month. *Id.* at 232.  NAS's letter to Luksch stated that "[y]our

17   association may apply your payments to assessments, penalties, if any, fines, if any, late fees,

18   interest, collection costs and other charges." *Id.*  There is a signature line on the letter for Luksch

19   to sign to agree to these terms. *Id.*  There is no evidence he did so.  By August 30, NAS sent him

20   a letter informing him that he had not made a payment under the payment plan. *Id.* at 234.

21         In September 2010, NAS advised Tuscalante that Luksch was requesting a twelve-month

22   payment plan, which Tuscalante approved. *Id.* at 236-39.  On November 22, NAS sent Luksch a

23   letter similar to the prior one proposing a $262 per month, twelve-month payment plan. *Id.* at

4

246.  This letter included the same language about the HOA applying any payments to assessments, penalties, late fees, and interest and had a signature line for Luksch. *Id.*  There is no evidence he signed the letter.  On December 30, 2020, NAS sent Luksch a letter stating he was not in compliance with the payment plan. *Id.* at 248.

On January 10, 2011, Luksch sent NAS a payment in the amount of $287. *Id.* at 250. There are no instructions accompanying the payment saying how it should be applied.  NAS distributed $87 to Tuscalante and used the remainder to pay collection costs. *Id.* at 252.

About two months later, Luksch sent another payment to NAS in the amount of $292. *Id.* at 262.  Luksch did not give instructions about how to allocate this payment either.  NAS sent $150 of this payment to Tuscalante, keeping the remainder for itself. *Id.* at 264.

In total, Luksch sent $579 to NAS, but NAS forwarded only $237 of that amount to Tuscalante.  Luksch thus sent enough to NAS to cover the $443.25 superpriority lien, but NAS did not forward enough to Tuscalante to cover that amount.  The parties thus dispute whether Luksch made sufficient pre-foreclosure payments to satisfy the superpriority amount.

There is no evidence Luksch directed how his payments were to be applied.  But Tuscalante had a collections policy that directed that partial payments would be applied to the oldest assessment first.  Tuscalante provided this policy to NAS and expected NAS to abide by it.  NAS apparently did not do so, instead keeping collection costs for itself before forwarding the remainder to Tuscalante.  There is no evidence Tuscalante objected to NAS's conduct.  But regardless of how Tuscalante and NAS dealt with each other, no genuine dispute remains that Tuscalante's official collections policy approved by its board provided that any partial payments would be applied to the oldest unpaid assessment first.  Under this policy, Luksch's payments satisfied the superpriority amount.

Premier argues that the policy allows for a different allocation by written agreement. It contends that NAS's letters to Luksch offering a payment plan advised him that Tuscalante could apply his payments to collection costs before assessments. Even assuming that is what the letters stated, there is no evidence Luksch agreed to these terms. There is no evidence he signed either payment plan, and he never made a payment that corresponded to either plan's terms.

Finally, to the extent Tuscalante's policy is unclear because it did not object when NAS deducted collection costs before remitting payment to it, I must determine the equitable allocation of Luksch's payments. The Supreme Court of Nevada provided some direction on how I am to make this determination. I "should make the allocation in view of all of the circumstances, as is most in accord with justice and equity and will best protect and maintain the rights of both the debtor and creditor." *Cranesbill Tr.*, 459 P.3d at 231 (quotation omitted). In reaching that determination, I should consider what the debtor likely desired when making the payment. *Id.* I also should consider that other jurisdictions recognize a "legal preference for paying the earliest matured debts." *Id.* In addressing this legal preference, I may consider whether "the unpaid HOA assessments and other costs the homeowner is required to pay to the HOA, such as the costs of foreclosure, to be on a running account, and therefore a single debt, or whether it considers there to be multiple accounts." *Id.* And I may reference general allocation guidelines in relevant treatises and Restatements, including those that relate to the debtor's obligation to third parties to pay the debt. *Id.* at 231 & n.4.

Here, it is likely that Luksch would prefer his payments be allocated to the superpriority amount. As noted by the Supreme Court of Nevada, in HOA foreclosure cases in Nevada, "it seems likely that a homeowner would prefer to cure the default on the superpriority lien before satisfying any other debts owed to an HOA to avoid a superpriority lien foreclosure and the

consequent loss of security to satisfy the obligation secured by the first deed of trust." *Id.* at 231 n.3.  This is consistent with the legal preference for paying the earliest matured debts, particularly for running accounts like Tuscalante's ledger. *See* 70 C.J.S. Payment § 55 (2019) (stating that "[i]n the case of a running account . . . the court generally will apply [unallocated payments] to the extinguishment of the earliest items of indebtedness"); 60 Am. Jur. 2d Payment § 72 (2019) (same).  This is also consistent with Tuscalante's stated policy, even if it acquiesced when NAS departed from that policy.  And this is in line with Luksch's contractual obligation under the deed of trust to pay assessments and other liens that can attain priority over the deed of trust. *See* ECF No. at 61-1 at 5; *Cranesbill Tr.*, 459 P.3d at 231 n.4 (stating that "a payment is generally allocated first to a debt that the debtor is under a duty to a third person to pay immediately") (quoting the Restatement (Second) of Contracts § 260(2)(a)).

Although Premier suggests that HOAs generally would prefer to credit the payment to collection costs because otherwise they could not hire collection agencies, there is no evidence to support that assumption.  Tuscalante's own policy was to apply payments to the oldest assessment first and it still contracted with NAS to collect unpaid assessments.

In sum, justice and equity support applying Luksch's payments to the oldest assessments due. *See Diakonos Holdings, LLC v. Katie Baby, LLC*, No. 77616, 462 P.3d 694, 2020 WL 2527451, at *1 (Nev. May 15, 2020) (holding that "the district court properly looked to the purpose of the relevant statutory scheme, [Nevada Revised Statutes] Chapter 116, and how partial payments have been applied to debts in other cases, in deciding that the homeowner's payments in this case applied to the assessments making up the superpriority default").  Because Luksch paid more than the superpriority amount, the superpriority lien was satisfied and the deed of trust was preserved by operation of law. *See Bank of Am., N.A. v. SFR Investments Pool 1,*

*LLC*, 427 P.3d 113, 116 (Nev. 2018) (en banc).  The sale was void as to the deed of trust by operation of law, so Premier's bona fide purchaser status is irrelevant. *Id.* at 121.  I therefore grant Bank of America's motion for summary judgment and deny Premier's motion.  Because the HOA sale did not extinguish the deed of trust, I dismiss as moot Bank of America's alternative damages claims against Tuscalante and NAS, so I deny as moot Tuscalante's motion for summary judgment.

That leaves Bank of America's unjust enrichment claim against Acadia.  No party moved for summary judgment on that claim, so it remains pending.

## II.  CONCLUSION

I THEREFORE ORDER that defendant Premier One Holdings, Inc.'s motion for summary judgment (**ECF No. 60) is DENIED**.

I FURTHER ORDER that plaintiff Bank of America, N.A.'s motion for summary judgment (**ECF No. 61) is GRANTED**.  I hereby declare that the homeowners association's non-judicial foreclosure sale conducted on April 26, 2013 did not extinguish the deed of trust, and the property located at 7424 Calzado Drive in Las Vegas, Nevada remains subject to the deed of trust.

I FURTHER ORDER that plaintiff Bank of America, N.A.'s damages claims against defendants Tuscalante Homeowners Association and Nevada Association Services, Inc. are DISMISSED as moot.

I FURTHER ORDER that defendants Tuscalante Homeowners Association's motion for summary judgment (**ECF No. 62) is DENIED as moot**.

DATED this 15th day of October, 2020.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE